UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x
CHARLES S. BROFMAN,                          :
                                             :            OPINION AND
          Plaintiff,                         :            ORDER
                                             :
     v.                                      :            11-CV-3528 (ER)
                                             :
CYBERSETTLE HOLDINGS, INC.,                  :
                                             :
          Defendant.                         :
———————————————————————x

RAMOS, D.J.:

 Plaintiff Charles Brofman brought this diversity action to seek, *inter alia*, payments he alleges that Defendant Cybersettle Holdings, Inc. ("CHI") owes him under a settlement agreement. The Parties agree that there are no genuine disputes of material fact on this issue and have cross-moved for partial summary judgment. The Court DENIES summary judgment to CHI and GRANTS summary judgment to Mr. Brofman.

## I. BACKGROUND

### A. Facts

 Charles Brofman and James Burchetta co-invented and patented an Internet-based application for the settlement of lawsuits. *See* Def.'s Counterstatement to Pl.'s Rule 56.1 Statement ¶ 2. They then formed a New York corporation, Cybersettle, Inc., which helped clients settle insurance claims using the patented application. *Id.* ¶ 3.

 On February 27, 2006, Mr. Brofman, Mr. Burchetta, and other investors, including a firm called XL Investments ("XL"), entered into an agreement ("the Contribution Agreement") in which CHI acquired Cybersettle, Inc. *Id.* ¶ 4. Under the Contribution Agreement, CHI received

all of Mr. Brofman's and Mr. Burchetta's shares in Cybersettle, Inc., and the patents for their

application.  *See id.*  Mr. Brofman and Mr. Burchetta received shares in CHI and an initial

payment of $1.5 million each.  *See id.* ¶ 5.

Section 5.3 of the Contribution Agreement also provided that, in addition to the initial

payment, Mr. Brofman and Mr. Burchetta would become eligible for certain payments ("the

Deferred Payments"):

> Inventors' Deferred Payments. The deferred payments described . . . above shall be
> payable  . . . (c) simultaneously with . . . (iii) any stock issuance, stock sale, merger,
> consolidation or other transaction or series of transactions as a result of which a majority
> of the outstanding capital stock of [CHI] (determined on a fully diluted basis) is held by
> persons who were not (or whose affiliates were not) stockholders of [CHI] immediately
> prior to such transaction(s) . . . Anything elsewhere contained in this Agreement to the
> contrary notwithstanding, the aggregate payments to be made by [CHI] pursuant to this
> Section 5.3 shall in no event exceed the sum of Seven Million ($7,000,000)[1] Dollars.

*Id.* ¶ 9.

Between 2006 and 2008, other investors bought shares of CHI.  *Id.* ¶ 11.  In 2008, one

investor in particular, Spencer Trask Corporate Partnering Group, LLC ("ST"), sought to acquire

a substantial share of the company from XL ("the ST/XL Transaction").  *See id.* ¶ 12.  Mr.

Brofman contends that this transaction would have resulted in a change of the majority

ownership of CHI and triggered the Deferred Payments to which he and Mr. Burchetta were

entitled under the Contribution Agreement.  Pl.'s Rule 56.1 Statement ¶ 13.  CHI does not deny

this.  Def.'s Counterstatement ¶ 13.

Although the Parties offer different versions of the ensuing negotiations, they agree that

they resolved their disputes through a second agreement on July 31, 2008 ("the Settlement

Agreement).  *Id.* ¶ 15; *see also id.* ¶ 16 (stating that "The [ST/XL T]ransaction was predicated on

Plaintiff releasing his claim to immediate payment [under the Contribution Agreement].").

---

[1] Of this amount, Mr. Brofman was entitled to $3.5 Million and Mr. Burchetta to $3.5 Million.  Contribution
Agreement § 5.2

The first, third, and fifth sections in the Settlement Agreement are relevant to this litigation.  The first section explains the effect of the ST/XL Transaction on the Contribution Agreement; it provides, in part, that:

> Sale of Shares from XL to ST. Each of Brofman and Burchetta hereby renounce and release any claim for accelerated payments in accordance with the Contribution Agreement that either of them may now or hereafter have or assert that either are due and owing any amounts from the Company or any other source pursuant to Section 5.3 of the Contribution Agreement as a result of the negotiation, execution and delivery of the Stock Purchase Agreement . . . by ST and XL and the consummation of the transactions contemplated thereby. . . . This renunciation and release shall specifically be for the Stock Purchase Agreement between ST and XL and shall not be deemed a permanent renunciation or release from any subsequent transaction except as specifically set forth below.

Settlement Agreement (Declaration of Charles S. Brofman, Ex. B) § 1.

The third section of the Settlement Agreement, entitled "Survival of Contribution Agreement," provides, in part, that "[u]nless specifically stated to the contrary herein, the Contribution Agreement shall remain in full force and effect from and after the date of this Settlement Agreement."  *Id.* § 3.

Finally, the fifth section of the Settlement Agreement contains releases.  Subsection (a) provides, in part, that:

> Releases by Brofman and Burchetta: Effective as of the date of this Agreement . . . each of Brofman and Burchetta . . .  hereby jointly and severally, voluntarily release and forever discharge [CHI] of the foregoing . . . from all [claims] in law or equity, which against [CHI], [Brofman or Burchetta] ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date hereof arising out of or relating to the Contribution Agreement, . . . the Stock Purchase Agreement [of the ST/XL Transaction] or the termination or the consummation of the transactions contemplated by each thereof.

*Id.* § 5(a).  A mirror provision in which CHI releases its claims against Mr. Brofman and Mr. Burchetta appears in Section 5(b).  *Id.* § 5(b).

In January 2009, Mr. Burchetta sold his stock and his interest in the Deferred Payments to CHI.  *Id.* ¶ 7.  Between December 2009 and December 2011, Mr. Brofman received $250,000 in payments from CHI.  *Id.* ¶ 8.  These two developments reduced the total amount of the Deferred Payments Mr. Brofman could be owed to $3,250,000.

The Parties agree that between 2006 and the filing of the Complaint in this case, CHI engaged in several transactions which changed who owned CHI stock.  *See id.* ¶ 22.  They disagree about the effect of these changes on Mr. Brofman's rights under the Settlement and Contribution Agreements.

Mr. Brofman claims that, "excepting the transfer of the ST Transaction as provided in the Settlement Agreement the majority of the outstanding capital stock of the Defendant, determined on a fully diluted basis, is held by persons who were not, or whose affiliates were not stockholders of the Defendant on February 27, 2006."  Pl.'s Rule 56.1 Statement ¶ 23.  Mr. Brofman then adds that "the documentation that CHI disclosed establishes that from the period of February 27, 2006 to the date this action was commenced, a change in the majority ownership of the capital shares of CHI on a fully liquidated basis occurred not later [than] May 10, 2011."  Pl.'s Rule 56.1 Statement ¶ 24.

CHI denies this but does not dispute Mr. Brofman's factual statement, only the legal conclusion he draws from it.  According to CHI, "[a]fter July 31, 2008 [the date of the Settlement Agreement] and up to the present day, shares of common stock of CHI have been issued to other investors (the "Transactions").  The Transactions, in the aggregate, have not triggered Brofman's right to payment under Section 5.3(c)(iii) of the Contribution Agreement."  Affidavit of Robert Ballou ¶¶ 14-15.[2]  CHI does not specifically deny Mr. Brofman's factual

---

[2] That Mr. Ballou's statement relies on a legal premise becomes clear in light of CHI's argument that Mr. Brofman "has failed to identify the 'transaction or series of transactions' that allegedly effect the change in majority

claim that majority ownership had changed relative to February 27, 2006, thus triggering the $3.25 million payment under the Contribution Agreement; instead, it responds with the legal claim that it "denies that there was a 'series' of transactions that triggers Plaintiffs right to payment of the sums sought in the First Count of Plaintiff's Complaint."  Def.'s Counterstatement ¶ 23.

### B. Procedural History

On May 24, 2011 Mr. Brofman filed suit against CHI in this Court.  He filed an Amended Complaint on December 13.  The Amended Complaint alleges two causes of action under New York contract law.  First, Mr. Brofman claims he is owed the remaining $3,250,000 of the Deferred Payments.  Am. Compl. ¶ 45.  Second, he claims he is owed other payments under the Contribution Agreement.  *See id.* ¶ 46-60.  In February and March of 2012, the Parties cross-moved for partial summary judgment on the first cause of action.  The Parties fully briefed the motions and were granted leave to file one additional letter each on an issue raised in Plaintiff's Reply Memorandum.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, a district court is instructed not to "weigh evidence," but to "resolve all ambiguities and draw all inferences in favor of the non-moving party" so as to ascertain "whether any reasonable trier of fact would have to conclude that the

---

ownership" because he must "include in his list of transactions many that were long ago released."  Def.'s Mem. at 7.  In other words, if one adopts CHI's position that the Settlement Agreement released transactions prior to the ST/XL Transaction, no change in ownership has occurred.

evidence was so strongly in the [movant's] favor that there remained no genuine issue of material fact for it to resolve."  *Nagle v. Marron*, 663 F.3d 100, 105 (2d Cir. 2011).

### B. New York Contract Law

The Parties agree that New York state contract law applies to this issue.  *See, e.g.*, Pl.'s Mem. at 9; Def.'s Mem. at 8.  A New York appellate court recently reiterated that "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent, and that the best evidence of what parties to a written agreement intend is what they say in their writing."  *Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade*, — N.Y.S.2d —, 2012 WL 3166658 at *2 (N.Y.A.D. 1st Dep't. Aug. 7, 2012) (brackets and quotation omitted).  Thus, the Court starts with the plain language of the Contribution and Settlement Agreements.

In this case, each side claims that its interpretation is an unambiguous reading of the Agreements' plain language. "Whether a contract is ambiguous is a question of law," *id.* (quotation omitted), which the Court must determine as a threshold question.  "[E]xtrinsic evidence may not be considered unless the document itself is ambiguous." *Id.* (quotation omitted).  Under New York law, "[a] contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (brackets and quotation omitted).

In this case, CHI relies on an argument that Mr. Brofman released his claim for the Deferred Payments arising from certain transactions.  *See, e.g.*, Def.'s Mem. at 5.  Under New York law, "[a] release . . . involves the present intent to abandon a right or claim to the party against whom the claim exists or against whom the right is to be exercised or enforced." *Clarke*

*v. Max Advisors, LLC*, 235 F.Supp.2d 130, 144 (N.D.N.Y. 2002) (citing to *McMahan & Co. v. Bass*, 673 N.Y.S.2d 19, 21 (N.Y.A.D. 1st Dep't. 1998)).  The burden of proving Mr. Brofman released his claims falls on CHI.  "Release is an affirmative defense which must be proven by the party asserting it." *Id.* (citing *DiIorio v. Gibson & Cushman of New York, Inc.*, 566 N.Y.S.2d 1, 2 (N.Y.A.D. 1 Dept. 1990)).

Releases are not to be interpreted in a vacuum.  Instead, "[w]here the provisions of a release are part of a written agreement which also contains other provisions relating to the rights and duties of the parties, the release provisions should be construed in the context of the entire agreement as a whole, including any separate but related documents." *Id.* (citing to *Schenectady Discount Corp. v. Myers*, 168 N.Y.S.2d 727, 729 (N.Y.A.D. 3d Dep't 1957)).

### C. Parties' Arguments

Mr. Brofman argues that he is now entitled to be paid his portion of the Deferred Payments under the Contribution Agreement.  Pl.'s Mem. at 13.  He claims that, according to "the Contribution Agreement, the [P]arties intended that the balance of the Deferred Payments would be due to Plaintiff upon a change of the majority of the stock ownership of the Company as it existed on February 27, 2006." *Id.*  He further claims that there is "no dispute as to the intent of the Contribution Agreement, or the fact that the CHI Stock Ledger shows that, excepting the ST/XL Transaction, a change of the majority ownership has occurred." *Id.*  Mr. Brofman reads the Settlement Agreement to exempt only the ST/XL Transaction from the Contribution Agreement's calculation about the change in majority ownership.

The only argument CHI can offer in response, Mr. Brofman contends, is that the Settlement Agreement's release provisions erased his rights under the Contribution Agreement. *See id.* at 13.  He argues that to adopt this interpretation would be "to ignore or discount the

specific provisions preserving the Plaintiff's rights under the Contribution Agreement and find

that the non-specific mutual releases eliminated or severely modified those rights." *Id.* at 15.

CHI argues that, in the Settlement Agreement, Mr. Brofman "released (1) any claim that

the ST-XL transaction should be counted in any calculation of change of majority ownership,

and (2) in a broadly worded general release, all claims he 'had, now [has], or hereafter can, shall

or may have, for, upon or by reason of any matter, cause or thing whatsoever from the beginning

of the world to the date hereof arising out of or relating to the Contribution Agreement.'" Def.'s

Mem. at 7 (quoting Settlement Agreement § 5(a)). CHI contends that the legal effect of these

releases was that Mr. Brofman "explicitly gave up the right to claim that the ST-XL transaction

and/or any stock transactions that preceded it should be taken into account in determining

whether Plaintiffs right to [the Deferred Payments] has been triggered." *Id.*

CHI's main interpretive argument is that Section 1 of the Settlement Agreement

provided, in part, that "This renunciation and release shall specifically be for the Stock Purchase

Agreement between ST and XL and shall not be deemed a permanent renunciation or release

from any *subsequent* transaction claim." *Id.* at 8 (quoting Settlement Agreement § 1 (emphasis

added by CHI)). By the principle of *inclusio unius est exclusio alterius*, CHI reasons that the

Settlement Agreement was a renunciation of any claim under the Contribution agreement based

on transactions *prior* to the ST/XL transaction. *Id.* at 8-9. CHI adds that, if there were any doubt

about whether Mr. Brofman released his claim based on prior transactions, the broad language of

the general release in Section 5(a) made clear that any claim based on those transactions was

released. *Id.* at 9-10.

In his opposition papers, Mr. Brofman offers two responses to CHI. First, he disputes

CHI's reading of Section 1 of the Settlement Agreement. Pl.'s Mem. in Opp. at 9. He

8

emphasizes that Section 1 contains a specific renunciation of claims based on the ST/XL Transaction and not of claims based on any prior transactions.  *See id.* at 9-10.  He argues that Section 1 must be read consistently with Section 3, which provides, in part, that "[u]nless *specifically* stated to the contrary herein, the Contribution Agreement shall remain in full force." *Id.* at 9 (quoting Settlement Agreement § 3).  Second, Mr. Brofman argues that the general release provision of Section 5(a) does not legally trump the specific release provision of Section 1.  *See id.* at 11-15.[3]

### E. Analysis

The Court starts, as it must, with the plain language of the Settlement Agreement as read in the context of the Contribution Agreement, which it explicitly references.  The Parties do not dispute that, at the time they signed the Contribution Agreement, Mr. Brofman became eligible for Deferred Payments in the event of a change in majority ownership of CHI.  The Parties agree that, for the purpose of calculating whether there has been a change in CHI's majority ownership, the ST/XL Transaction does not count but transactions *subsequent to* the ST/XL transaction do count.  Therefore, the only real interpretative dispute between the Parties is whether transactions *prior to* the ST/XL Transaction count for the purpose of determining whether there has been a subsequent change in majority ownership.

CHI's two arguments for its claim that the transactions prior to the ST/XL Transaction do not count—first, that the language of Section 1 suggests that the prior transactions will not count,

---

[3] The Parties' Reply Memoranda largely rehash their earlier arguments with one exception.  Mr. Brofman alleges in his Reply Memorandum that Michael Turillo, a CHI Director, told him that "[CHI] know[s] we owe you the money but if you demand it now we can't pay it."  Pl.'s Reply Mem. at 5.  The Court granted the Parties leave to file brief letters on this issue.  CHI argued that the statement was inadmissible as hearsay and as a communication made in furtherance of a settlement.  *See* CHI Letter of May 30, 2012.  Mr. Brofman argued that the statement was admissible as an admission of a party opponent.  *See* Brofman Letter of June 1, 2012.  The Court need not resolve this issue because the plain language of the Agreements is unambiguous.

and second, that the general release of Section 5 releases Mr. Brofman's potential claim based on the prior transactions—are unpersuasive.

Section 1 of the Settlement Agreement provides in relevant part:

<u>Sale of Shares from XL to ST</u>. Each of Brofman and Burchetta hereby renounce and release any claim for accelerated payments in accordance with the Contribution Agreement that either of them may now or hereafter have or assert that either are due and owing any amounts from the Company or any other source pursuant to Section 5.3 of the Contribution Agreement as a result of the negotiation, execution and delivery of the Stock Purchase Agreement . . . by ST and XL and the consummation of the transactions contemplated thereby. . . . *This renunciation and release shall specifically be for the Stock Purchase Agreement between ST and XL and shall not be deemed a permanent renunciation or release from any subsequent transaction except as specifically set forth below.*

Settlement Agreement § 1 (emphasis added).

As explained above, CHI argues that the phrase "any subsequent transaction" implies, via the *inclusio unius* canon, that "any *prior* transaction" was part of the release. But the full sentence is a conjunct. As Mr. Brofman points out, the release is "specifically" for the ST/XL Transaction. The same *inclusio unius* reasoning would imply that the release is not for any other transaction.

The rest of Section 1 supports Mr. Brofman's interpretation. He and Mr. Burchetta explicitly "release" any claim from the ST/XL Transaction and no other. Furthermore, the Section is entitled "Sale of Shares from XL to ST"—making clear the transaction to which the Section infers.

More importantly, the language of Section 3 further supports Mr. Brofman's interpretation. That Section provides, in part, that "[u]nless specifically stated to the contrary herein, the Contribution Agreement shall remain in full force." Settlement Agreement § 3. Therefore, for Mr. Brofman to release his claim to the Deferred Payments based on the transactions prior to the Settlement Agreement, the Settlement Agreement would need to

specifically so provide.  But all the Settlement Agreement specifically provides is his release of the ST/XL Transaction.  Section 1 does not refer to—and therefore does not *specifically release*—the prior transactions at all.  In light of that absence, the default rule of Section 3—that the terms of the Contribution Agreement remain in force—kicks in.

CHI's second argument is that the general release provision of Section 5 includes a release of any claim to the Deferred Payments that Mr. Brofman would have from the transactions prior to the Settlement Agreement.  In analyzing this argument, the Court is mindful that "releases containing standardized and ritualistic language are often given under circumstances where the parties are not looking beyond the precise matter in dispute that is being settled."  *Green v. Lake Placid 1980 Olympic Games, Inc.*, 538 N.Y.S. 2d 82, 84 (N.Y.A.D. 3d Dep't. 1989) (citing *Mangini v. McClurg*, 24 N.Y. 2d 556, 562 (N.Y. 1969)).

At first glance, this argument proves too much.  If the general release of Section 5 releases all claims Mr. Brofman could have against CHI, it would erase the language of Section 3, which provides that the Contribution Agreement remains in force, and the language of Section 1, which even CHI concedes preserves Mr. Brofman's right to the Deferred Payments if transactions subsequent to the Settlement Agreement were to result in a change of ownership.

CHI offers a more subtle response.  Section 5, it points out, is a release of "all [claims] in law or equity, which against [CHI], [Mr. Brofman or Mr. Burchetta] ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date hereof arising out of or relating to the Contribution Agreement."  Therefore, CHI contends, "[i]t is clear that a release worded as broadly as this one is intended to release any and all possible claims arising from events occurring prior to the date of the release."  Def.'s Mem. at 9.

The problem with this argument is that Mr. Brofman is not now making a claim that he had at the time of the Settlement Agreement. Excepting the ST/XL Transaction, there was no change in majority ownership at the time of the Settlement Agreement. Mr. Brofman is making a claim that a change in majority ownership has occurred as a result of transactions prior to *and subsequent to* the Settlement Agreement, a claim he could not have made at the time of the Settlement Agreement. All he is asserting is that the calculation laid out in the Contribution Agreement still applies and still includes the transactions prior to the Settlement Agreement.

In other words, Mr. Brofman is claiming that (1) the language of the Contribution Agreement still applies and (2) he can make a post-Settlement Agreement claim based on that language. Section 3 of the Settlement Agreement clearly provides that the language of the Contribution Agreement remains in force. Section 1 only specifically exempts the ST/XL Transaction from the calculation the Contribution Agreement foresees. Section 5 does not speak to the calculation of the Contribution Agreement, only to claims arising under the Contribution Agreement that existed prior to the Settlement Agreement.

A New York appellate court has explained that:

> Well settled is the rule of law that . . . [a] release may contain specific recitals as to the claims being released, and yet conclude with an omnibus clause to the effect that the releasor releases and discharges all claims and demands whatsoever which he or his heirs, executors, administrators, or assigns have or may have against the releasee. In such situations, the courts have often applied the rule of ejusdem generis, and held that the general words of a release are limited by the recital of a particular claim, where there is nothing on the face of the instrument, other than general words of release, indicating that matters other than those specifically referred to were intended to be discharged.

*Green*, 538 N.Y.S. 2d at 84 (citations omitted).

Therefore, the plain language of the Settlement Agreement supports Mr. Brofman's position. Because CHI does not dispute his factual claim that, if the transactions prior to the

Settlement Agreement are included, subsequent transactions have caused a change in a majority ownership, Mr. Brofman is entitled to the Deferred Payments as a matter of law.

## CONCLUSION

The Court concludes that there is no genuine dispute of material fact on the first claim in Mr. Brofman's Complaint. The Court holds that Mr. Brofman is entitled to summary judgment on that claim.

The Court therefore DENIES CHI's motion for partial summary judgment. The Clerk of the Court is respectfully directed to terminate this motion (Doc. 13).

The Court GRANTS Mr. Brofman's motion for partial summary judgment. The Clerk of the Court is respectfully directed to terminate this motion (Doc. 18).

The Parties are directed to appear for a status conference on October 9, 2012 at 10:30 AM.

It is SO ORDERED.

Dated: September 18, 2012
White Plains, NY

Edgardo Ramos, U.S.D.J.